UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

------------------------------------------------------

DR. ROBIN FORD,

               plaintiff,

        v.

LOUISIANA STATE BOARD OF MEDICAL
EXAMINERS, and CHRISTY L. VALENTINE,
M.D., sued in her official capacity only,

           defendant.

------------------------------------------------------

**CASE NO. 18-cv-_____**

**JUDGE _____**

**MAGISTRATE JUDGE _____**

**JURY TRIAL DEMANDED ON
SPECIFIC ISSUES**

## <u>COMPLAINT</u>

**BIZER & DEREUS, LLC**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Marc P. Florman (LA # 35128)
mflorman@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

## PRELIMINARY STATEMENT

1.      The Louisiana State Board of Medical Examiners (hereinafter the "LSBME") is the political subdivision authorized to issue medical licenses in the State of Louisiana. This case concerns the broad and discriminatory policy of the LSBME that doctors with a diagnosed psychiatric condition must undergo lifetime monitoring and sign an onerous monitoring contract with an organization known as the Physicians' Health Foundation of Louisiana—regardless of their individualized circumstances. In contrast, Title II of the Americans with Disabilities Act ("ADA") requires that public entities such as the LSBME must perform individualized assessments of persons with disabilities and make reasonable accommodations. The LSBME's one-size-fits-all policy does not allow for individualized assessments and is discriminatory on its face.

2.      Dr. Robin Ford is a Doctor of Osteopathic Medicine licensed by the LSBME. Dr. Ford has manic depressive (bipolar) disorder, which at times has caused her to experience somatic complaints, confusion, agitation, and manic episodes. As a result of her bipolar disorder, and also as a result of her past attempts to self-medicate, Dr. Ford also suffered from substance abuse. Despite her disability, Dr. Ford has functioned as a competent, safe, and professional physician.

3.      Dr. Ford has had no issues since 2010.

4.      In 2006/2007 Dr. Ford took a leave of absence from the practice of medicine and allowed her license to expire due to non-renewal on March 31, 2008. In February of 2011, following a vigorous and difficult re-admission process, Dr. Ford was approved on a probation status to resume the practice of medicine. One of the many requirements, however, was that Dr. Ford must "continue in, abide by and strictly adhere to all recommendations for ongoing treatment and monitoring of her condition, which have or may be contained in her PHP monitoring

agreement, or any subsequent agreement which may be recommended by the PHP…"

5.     The PHP stands for the "Professionals' Health Program", which is a program operated by the Physicians' Health Foundation of Louisiana. The stated "primary purpose" of the PHP is "to offer assistance to health care professionals who may be suffering from difficulties such as substance use issues, depression, anxiety, etc., in addition to a host of physical ailments and disruptive behavior patterns." The Physicians' Health Foundation of Louisiana frequently and regularly operates upon the direction of the Louisiana State Board of Medical Examiners.

6.     Since well before 2010, Dr. Ford has been regularly taking her medications and the symptoms of her bipolar disorder have not manifested. According her psychiatrist, Dr. Ford "will only require periodic follow-up, currently every six months, with only intermittent lab work as necessary."

7.     Due to her great progress, on January 17, 2017 Dr. Ford was sent a letter by the Physicians' Health Foundation of Louisiana which stated that "Effective 1/17/2017, you are released from monitoring and are no longer required to fulfill the terms and conditions of your Monitoring contract."

8.     Despite no changes to Dr. Ford's condition and no reoccurrences of her bipolar disorder, on April 26, 2017 the LSBME suddenly sent Dr. Ford a letter stating "**The Board believes that licensees currently practicing with diagnosed psychiatric conditions should continue monitoring with HPFL-PHP by signing a lifetime monitoring contract. Please contract Dr. Hammond at HPFL-PHP to schedule an appointment to meet with him to discuss your monitoring requirements and sign a new contract if applicable.**" (emphasis added).

9.     This action concerns the decision of the LSBME to force Dr. Ford to endure

arbitrary, burdensome, invasive, and unnecessary restrictions and monitoring requirements—regardless of her individualized circumstances.

10.     By forcing Dr. Ford to endure arbitrary, burdensome, invasive, and unnecessary restrictions and monitoring requirements because of her disability, the LSBME and Christy L. Valentine, M.D. (sued in her official capacity only) committed discrimination in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*.

11.     Dr. Ford seeks injunctive and declaratory relief, compensatory and nominal damages, and attorneys' fees and costs to redress Defendants' unlawful discrimination. With regards to Dr. Ford's request for nominal damages, it is Dr. Ford's position that an award of nominal damages would confer significant civil rights to the public, as a judgment in her favor against Defendants, regardless of the amount, would deter Defendants from discriminating against individuals with mental disabilities in the future.

## THE PARTIES

12.     Plaintiff Dr. Robin Ford (hereinafter "Dr. Ford") is an individual residing in Calhoun, Louisiana. Dr. Ford has manic depressive (bipolar) disorder and is substantially limited in several major life activities. In fact, under Title II of the ADA bipolar disorder is an impairment that leads to a predicable assessment of a disability. *See* 28 C.F.R. § 35.108(d)(2)(iii). As such, Dr. Ford is a qualified person with a disability within the meaning of the ADA.

13.     Defendant LOUISIANA STATE BOARD OF MEDICAL EXAMINERS (hereinafter "LSBME"), is a Louisiana political subdivision. The LSBME's office address is located at 630 Camp Street, New Orleans, Louisiana 70130. The LSBME's principal place of business is in New Orleans, Louisiana. The LSBME is subject to the requirements of Title II of the ADA.

14.     Plaintiff brings suit against the LSBME for injunctive and declaratory relief, compensatory and nominal damages, and attorneys' fees and costs.

15.     Defendant CHRISTY L. VALENTINE, M.D. (hereinafter "Dr. Valentine"), sued in her official capacity only, is the president of the board of the LSBME is thereby its chief executive. Dr. Valentine is sued in her official capacity only pursuant to the doctrine of Ex parte Young.

16.     Plaintiff brings suit against Dr. Valentine for injunctive and declaratory relief and attorneys' fees and costs.

## JURISDICTION & VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Dr. Ford's claims arising under federal law.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants reside within the jurisdiction of this District, and/or a substantial part of the events that give rise to the claims occurred in this District, and/or Defendants committed discriminatory acts within the jurisdiction of this District.

## STATEMENT OF FACTS

A.     *The Louisiana State Board of Medical Examiners Published a Study in Which it Admitted that it Disciplines Physicians for Mental Health Issues Not Related to Substance Abuse.*

19.     According to the LSBME, its purpose is to protect "the health, welfare and safety of Louisiana citizens against the unprofessional, improper, and unauthorized practice of medicine by ensuring that those who practice medicine and other allied health professions under our jurisdiction are qualified and competent to do so."

20.     On August 24, 2017, the LSBME published an article to its website entitled Training Matters. The Training Matters study was conducted by Susan H. Allen, DrPH, MBA,

Robert L. Marier, MD, MHA, Cecilia Mouton, MD, and Arti Shankar, PhD.

21.     Dr. Cecilia Mouton is an executive staff member at the LSBME and is the Director of Investigations.

22.     The Training Matters study used proprietary LSBME files and information. According to a quote from the study:

> The data were extracted from the board's licensing and investigation files and merged with training and certification information from the AMA Master Data file obtained in December 2011. Using information from proprietary board files, the American Board of Medical Specialties, and practice-specific websites, training information was verified before the data was de-identified.

23.     Which not officially a project of the LSBME, the Training Matters study has the imprimatur of the LSBME given that it was posted on the LSMBE website, was conducted by an executive staff member of the LSBME, and utilized proprietary LSBME files and materials.

24.     According to the Training Matters study, 624 physicians were disciplined between 1990 and 2010. The authors of the Training Matters study broke the "Cause of Action" for discipline into nine categories, including conduct such as "improper prescribing," "fraud/lying," and "committed crime." The basis for discipline against a physician was cataloged into one of the nine categories.

25.     One of the nine discrete categories is "mental health not related to substance abuse."

26.     According to the Training Matters study, between 1990 and 2010 ninety-nine physicians were disciplined for "mental health not related to substance abuse." This represents a total of 16% of the total physicians disciplined between 1990 and 2010.

27.     The Training Matters study suggests that, instead of providing doctors who have a psychiatric disability with an individual assessment and reasonable accommodation, the LSBME has a history, practice, and policy of disciplining doctors with a mental health disability. This practice or policy is further documented by the experience of the plaintiff in this action, Dr. Robin

Ford.

B.    _Dr. Ford is a Qualified Individual with a Disability Who Has Been Safely Practicing Medicine in Louisiana for the Last Eight Years Without any Issues._

28.    Plaintiff is a Doctor of Osteopathic Medicine licensed by the State of Louisiana.

29.    Dr. Ford completed her degree in Osteopathic Medicine in 1990 at Kirksville College of Osteopathic Medicine, in Kirksville, Missouri.

30.    Dr. Ford completed her internship in 1991 and was licensed to practice in Louisiana.

31.    Dr. Ford has manic depressive (bipolar) disorder, which at times has caused symptoms including somatic complaints, confusion, agitation, and manic episodes. As a result of her bipolar disorder, and also as a result of her past attempts to self-medicate, Dr. Ford also suffered from substance abuse in the past.

32.    For more than ten years, Dr. Ford has not had any issues with substance abuse.

33.    Over twenty years ago, on April 5, 1995, the LSBME and Dr. Ford entered into a Consent Order ("1995 Consent Order"). This Consent Order was based on an investigation conducted by the Director of Investigations of the LSBME.

34.    Under the 1995 Consent Order, Dr. Ford agreed to be placed on probation for a period of five (5) years. The 1995 Consent Order contained various other terms, such as a participation in a Physicians Health Program.

35.    Over the following four years, Dr. Ford struggled with her bipolar disorder. As a result of her disability, at times Dr. Ford used psychoactive medications in a non-controlled manner. Dr. Ford was eventually diagnosed with opiate dependence.

36.    Dr. Ford's use of psychoactive medications and opiates in a non-controlled manner was caused by her bipolar disorder.

37.     Due to various bipolar-related symptoms, in 1997 Dr. Ford entered into a Superseding Order with the LSBME.

38.     In 1998 Dr. Ford entered into a Superseding Consent Order for which her license to practice medicine was placed on indefinite probation with requirements for ongoing monitoring and treatment.

39.     Over ten years ago, in 2006 Dr. Ford suffered a relapse and underwent treatment and diagnosis. In lieu of entering a residential treatment facility, Dr. Ford elected to remove herself from the practice of medicine and allowed her license to expire due to non-renewal on March 31, 2008.

40.     In November of 2009, Dr. Ford approached the Investigating Officer of the LSBME to determine the steps that would be necessary to reinstate her license.

41.     Dr. Ford has readily and willingly accepted the limitations caused by her disability. Despite these limitations, Dr. Ford has endeavored to function as a competent, safe, and professional physician.

42.     Dr. Ford was advised by the LSBME that she needed to demonstrate her competence to return to clinical practice, provide evidence that her medical/psychiatric conditions were stable, and resume monitoring by the PHP.

43.     In February of 2011, following a vigorous and difficult re-admission process, Dr. Ford was approved on a probation status to resume the practice of medicine.

44.     Prior to having her license reinstated, Dr. Ford and the LSBME agreed upon the terms of a Second Superseding Consent Order, which was signed on February 14, 2011 (hereinafter the "2011 Consent Order").

45.     One of the many requirements of the 2011 Consent Order was that Dr. Ford must

"continue in, abide by and strictly adhere to all recommendations for ongoing treatment and monitoring of her condition, which have or may be contained in her PHP monitoring agreement, or any subsequent agreement which may be recommended by the PHP…" (hereinafter the "PHP Monitoring Requirement").

46.   However, the PHP Monitoring Requirement clearly provided PHP with the discretion, control, and authority to determine the scope, frequency, and nature of the monitoring that was required for Dr. Ford. Said decisions are to be made by the PHP.

47.   This arrangement acknowledges the intimate familiarity and knowledge that the PHP has about any individual physician it is monitoring. In contrast at any one monthly board meeting the LSBME handles numerous legal, business, and regulatory matters.

48.   The discretion afforded to the PHP under the 2011 Consent Order reflects the unique position of the PHP to determine the amount of monitoring that is appropriate any physician based on the physician's individualized circumstances.

49.   The Physicians' Health Foundation of Louisiana frequently and regularly operates upon the direction of the Louisiana State Board of Medical Examiners.

50.   In compliance with the PHP Monitoring Requirement, Dr. Ford approached the PHP regarding the contract she must enter into regarding monitoring of her condition. In approximately 2011, Dr. Ford entered into a five-year monitoring contract with the PHP (the "PHP Contract").

51.   Under the PHP Contract, Dr. Ford was obligated to comply with the following requirements:

- Blood, urine, or hair testing an average of every two weeks;

- Aftercare one night a week for two years, which was an hour drive Dr. Ford's house;

- Psychiatric evaluation every three months at Dr. Ford's expense;

- Attend AA meetings throughout the week;

- Attend weekly Caduceus meeting for Health Professionals; and

- Meet with PHP regularly throughout the year.

52.    Under the PHP Contract, Dr. Ford was forced to undergo urine screens. These urine screens required individuals to observe her urinate. This was allegedly required to establish a "chain of custody." Dr. Ford was highly embarrassed by having to urinate in front of others.

53.    The PHP Contract also cost Dr. Ford significant time and personal expense. Dr. Ford had to pay for each urine or blood test out of pocket.

54.    Since well before 2010, Dr. Ford has been taking her medications and the symptoms of her bipolar disorder have been in remission.

55.    Dr. Ford has had no relapses since 2010.

56.    Dr. Ford's employer has regularly submitted reports to the LSBME indicating that Dr. Ford is a model employee.

57.    Dr. Ford's psychiatrist has regularly submitted reports indicating that Dr. Ford's bipolar disorder is in remission.

58.    The requirement of the five-year PHP Contract were not narrowly tailored for Dr. Ford's individual circumstance. Nonetheless, Dr. Ford strictly complied with these requirements.

59.    According to Dr. Ford's Psychiatrist, Dr. Ford "will only require periodic follow-up, currently every six months, with only intermittent lab work as necessary."

60.    Due to her substantial improvement, on January 17, 2017 Dr. Ford was sent a letter by the Physicians' Health Foundation of Louisiana which stated that "Effective 1/17/2017, you are released from monitoring and are no longer required to fulfill the terms and conditions of your

Monitoring contract."

61.     Following this letter, Dr. Ford was told by her case manager at PHP that she was required to enter into a post monitoring contract. (hereinafter the "Post-Monitoring Contract"). Under the Post-Monitoring Contract, Dr. Ford was required to submit to random blood or urine screens approximately every two months. Additionally, Dr. Ford was required to submit to a Psychiatric evaluation every six months.

62.     While still burdensome, the Post-Monitoring Contract was significantly less burdensome and afforded her greater freedom. It also reduced the embarrassment to Dr. Ford of in-person urine tests. Further, the Post-Monitoring Contract reduced the burdensome monetary expense of a blood or urine test every two weeks.

63.     Dr. Ford was subject to the Post-Monitoring Contract for nine months with no issues.

C.     _Without Performing an Individualized Assessment of Dr. Ford, The LSBME Unilaterally Decided that Dr. Ford Must Sign an Onerous and Burdensome Lifetime Monitoring Contract._

64.     As part of her indefinite probation, one restriction was on Dr. Ford's ability to prescribe controlled substances.

65.     On April 10, 2017, Dr. Ford personally appeared before the LSBME and requested reinstatement of her prescribing privileges.

66.     Dr. Ford's presentation to the LSBME was short—it was approximately fifteen minutes long. During Dr. Ford's presentation to the Board, a member of the LSBME made a statement that implied that Dr. Ford should sign a lifetime monitoring contract with the HPFL.

67.     Dr. Ford's request for reinstatement of her prescribing privileges was taken under advisement.

68.     Despite no changes to her condition, no patient complaints, no employer

complaints, and no manifestations of the symptoms of her bipolar disorder, on April 26, 2017 the LSBME sent Dr. Ford a letter that imposed new and burdensome conditions on her.

69.     In the April 26, 2017, the LSBME stated that it was taking Dr. Ford's request for reinstatement of her prescribing privileges under advisement.  The letter went on to state that "**The Board believes that licensees currently practicing with diagnosed psychiatric conditions should continue monitoring with HPFL-PHP by signing a lifetime monitoring contract. Please contract Dr. Hammond at HPFL-PHP to schedule an appointment to meet with him to discuss your monitoring requirements and sign a new contract if applicable.**" (emphasis added). The letter was signed by Esparonzia B. Spooner, a Program Compliance Officer at the LSBME.

70.     Dr. Hammond is the Medical Director of the HPFL-PHP.

71.     By and through its April 26, 2017 letter, the LSBME modified the terms of the 2011 Consent Order. Specifically, the LSBME modified and changed the PHP Monitoring Requirement which provided discretion to the HPFL to determine the amount of monitoring that was appropriate and necessary.

72.     On the same day, April 26, 2017, Dr. Hammond called Dr. Ford and told her that the PHP had made a "mistake" when it released Dr. Ford from her monitoring contract. Dr. Hammond's statement that PHP had made a "mistake" was contemporaneously documented by Dr. Ford in a letter sent to Dr. Cecilia Mouton on April 26, 2017.

73.     Dr. Hammond also stated during this call that he spoke with Dr. Cecilia Mouton, an executive staff member at the LSBME. According to Dr. Hammond, Dr. Mouton stated that all physicians with a psychiatric diagnosis must be in a lifetime monitoring contract.

74.     Dr. Hammond stated that if Dr. Ford did not sign a lifetime contract, he would

report Dr. Ford to the LSBME and that Dr. Ford's medical license would be taken away.

75.   Based on the apparent lack of options, and given the threat of her medical license being taken away, on May 15, 2017 Dr. Ford signed a new monitoring contract (hereinafter the "New Monitoring Contract").

76.   According to the New Monitoring Contract "This agreement is in effect from 5/15/17 to retirement."

77.   Nowhere in the 2011 Consent Order does it state that Dr. Ford is obligated to enter into a lifetime contract. In fact, the language states that Dr. Ford must agree to terms "which have or may be contained in her PHP monitoring agreement, or any subsequent agreement which may be recommended by the PHP." This contractual language makes it clear the Dr. Ford had no obligation to enter into a lifetime contract with the PHP.

78.   Under the New Monitoring Contract, Dr. Ford agreed to drug testing by breath, blood, urine, saliva, and/or hair sample.

79.   The language of the 2011 Consent Order states that "Dr. Ford shall submit to periodic, unannounced blood, urine, saliva and/or hair collection for testing." Nowhere does the 2011 Consent Order say that Dr. Ford is obligated to submit to breath testing.

80.   While the New Monitoring Contract does not specify how frequency Dr. Ford will be tested, since signing the New Monitoring Contract Dr. Ford has been tested approximately every two weeks.

81.   Further, the New Monitoring Contract states that "These tests will be random, observed, and have a chain of custody."

82.   Nowhere in the 2011 Consent Order does it state that Dr. Ford is obligated to be observed while she urinates during urine collections.

83.     Under the New Monitoring Contract, Dr. Ford must attend Alcoholics Anonymous one time per week.

84.     Nowhere in the 2011 Consent Order does it state that Dr. Ford is obligated to attend Alcoholics Anonymous meetings.

85.     Under New Monitoring Contract, Dr. Ford bears all expenses associated with her participating the new monitoring agreement.

86.     Dr. Ford was also forced to sign a document entitled "Maintenance of Abstinence." (hereinafter "Maintenance of Abstinence"). Pursuant to the Maintenance of Abstinence, Dr. Ford must abstain from a long list of products. The products Dr. Ford must abstain from extend well beyond what is required by the 2011 Consent Order.

87.     Under the 2011 Consent Order, Dr. Ford must abstain from "alcohol, controlled and other mood-altering substances including, but not limited to, Tramadol."

88.     In contrast, under the Maintenance of Abstinence, Dr. Ford was required to sign on May 15, 2017, Dr. Ford must abstain from over-the-counter medications, poppy seeds, alcohol free wine or beer, mouthwash, communion wine, or any hygiene products containing ethanol.

89.     Under the Maintenance of Abstinence, Dr. Ford can neither eat a poppy seed bagel or utilize sterilizing alcohol on her wounds.

90.     During the week of March 26, 2018, Dr. Ford had another conversation with Dr. Hammond. During this conversation Dr. Ford asked Dr. Hammond why she was now required to be tested ever two weeks even though she had previously been approved for a post-monitoring contract under which she was only tested ever two months.

91.     Dr. Hammond responded to Dr. Ford that she was required to be tested every two weeks because the LSBME wanted her tested that often.

92.     Dr. Hammond's statement that the LSMBE wanted Dr. Ford tested every two weeks was contemporaneously documented by Dr. Ford in an email she sent to Esparonzia Spooner on April 2, 2018.

93.     Since signing the New Monitoring Contract and the Maintenance of Abstinence agreement on May 15, 2018, Dr. Ford has remained in compliance with both agreements.

94.     Further, as a result of the constant drug tests under the New Monitoring Contract, Dr. Ford is unable to schedule travel for pleasure. Dr. Ford is essentially trapped in Louisiana because she is forced to choose between traveling for pleasure and maintaining compliance with the continuous drug screening.

95.     In asking Dr. Ford to sign the New Monitoring Contract and the Maintenance of Abstinence agreement, Dr. Hammond and PHP were acting on behalf of Defendants.

96.     By and through the actions set forth above, Defendants were engaged in a contractual, licensing, or "other arrangement" with the HPFL.

D.     *Dr. Ford Experienced Discrimination Because of Defendants Did Not Perform an Individualized Assessment, Subjected Her to Unnecessary Burdens, and Failed to Provide Her with a Reasonable Accommodation.*

97.     The actions of Dr. Hammond and the PHP are the result of the decisions, choices, and/or actions by Defendants to impose greater restrictions and monitoring requirements on Dr. Ford because she has a disability.

98.     The constant drug testing of Dr. Ford is not a legitimate safety requirement necessary for the safe operation of Defendants' programs, services, or activities.

99.     The constant drug testing of Dr. Ford is an eligibility criterion that is not necessary for the provision of the service at issue, namely, the licensure of doctors who are qualified to practice medicine.

100.     The LSBME has imposed burdensome terms and conditions on Dr. Ford based on

her diagnosis rather than her actual conduct.

101.    The LSBME has imposed burdensome terms and conditions on Dr. Ford that are not individually tailored to the actual risk.

102.    The constant drug testing of Dr. Ford imposes an unnecessary burden on Dr. Ford that is not imposed on others without disabilities.

103.    The requirement that Dr. Ford attend Alcoholics Anonymous meetings indefinitely imposes an unnecessary burden on Dr. Ford that is not imposed on others without disabilities.

104.    The Maintenance of Abstinence agreement Dr. Ford was forced to sign imposes an unnecessary burden on Dr. Ford that is not imposed on others without disabilities.

105.    The LSBME's monitoring conductions impose improper financial burdens on licensees with disabilities.

106.    The burdensome terms and conditions imposed by the LSBME impermissibly tends to screen out individuals with disabilities and subject them to additional burdens.

107.    Maintaining compliance with the new agreements imposed by the LSBME has imposed a substantial emotional, mental, and financial toll on Dr. Ford.

108.    Indeed, evidence that Defendants committed discrimination can be seen from the fact that in February of 2014, the United States Department of Justice, Civil Rights Division sent a letter to the Louisiana Supreme Court. [1]

109.    Much of the restrictions and limitations imposed by Defendants on Dr. Ford have direct parallels to the restrictions and limitations imposed by the Louisiana Supreme Court on attorneys with mental disabilities.

---

[1] *See* Exhibit "A."

110.    In February of 2014 letter to the Louisiana Supreme Court, the United States Department of Justice stated that one form of discrimination includes imposing conditions of admission that are not individually tailored to actual risk. Indeed, the below statement from the DOJ explains the nature of this form of discrimination:

> "The Admissions Committee and the ODC impose intrusive and onerous conditions of admission upon applicants with disabilities. These conditions inappropriately burden applicants with disabilities, limiting their employment opportunities and interfering with their relationships with employers, clients, and psychiatrists. Attorneys whose conditional admission is improperly predicated on mental health diagnoses have found it more difficult to obtain employment, have had to share information about their mental health diagnoses with employers, have been treated differently because their employers and colleagues were aware of their mental health status, have been asked to disclose clients' files, and have been distracted from their work by inflexible monitoring requests. These attorneys have made decisions about their treatment based on the Admissions Committee's requirements instead of their health, have been less able to share information freely with their psychiatrists, and have refrained from considering a full range of treatment options. They have made career decisions that are based on their conditional admission status and monitoring requirements rather than their talents and interests. The discriminatory imposition of conditional admission upon applicants with mental health diagnoses on the basis of their diagnoses has substantial detrimental effects."

111.    Defendants, through their staff, employees, and/or executives, knew or should have known of their obligations under the ADA, including individuals who have bipolar disorder, and to develop policies to promote compliance with these statutes.

112.    Defendants, through their employees, agents, and/or executives, knew or should have known that their actions and/or inactions created an unreasonable risk of causing Dr. Ford to experience greater levels of fear, anxiety, indignity, humiliation, emotional distress, and expense than a non-disabled person would be expected to experience.

113.    The harm sustained by Dr. Ford herein is the expected and foreseeable consequence of Defendants' failure to comply with the requirements and mandates of federal civil rights laws. These statutes and accompanying regulations exist to ensure that individuals with disabilities will have full use of all services, programs, and activities provided or made available by public entities.

When Defendants failed to adhere to their obligations under these statutes and regulations, it was imminently foreseeable that Dr. Ford would sustain the exact harms alleged in this lawsuit.

114.    Despite Defendants' explicit knowledge of their obligation to accommodate persons with disabilities and avoid discrimination – including individuals that have bipolar disorder – Defendants did not take adequate steps to ensure that they accommodated Dr. Ford by assessing her individual circumstances. Nor did Defendants take adequate steps to avoid discrimination on the basis of disability.

115.    Defendants discriminated against Dr. Ford with deliberate indifference to her rights under the ADA.

116.    Based on the facts alleged above, Defendants intentionally discriminated against Dr. Ford.

117.    Further, Defendants were purposeful in their choices, which is sufficient to constitute intentional discrimination under the ADA.

118.    Due to the ongoing discrimination she has and is still encountered, Dr. Ford reasonably anticipates that she will continue to experience discrimination until an Order is entered by the Court mandating that Defendants cease their discrimination against Dr. Ford.

119.    In the alternative, Defendants are liable under the ADA pursuant to the case of *Kelly v. Boeing Petroleum Servs., Inc.*, in which the Fifth Circuit held that the Supreme Court case of *Alexander* expressly rejected the notion that a plaintiff is required to show intentional discrimination to establish a prima facie case of disparate impact discrimination under the RA. 61 F.3d 350, 365 (5th Cir. 1995).

## **CLAIM FOR RELIEF: VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT**

120.    Dr. Ford repeats and realleges all preceding paragraphs in support of this claim.

121.    At all times relevant to this action, Title II of the ADA, 42 U.S.C. § 12131, *et seq.* has been in full force and effect and has applied to the Defendants' conduct.

122.    At all times relevant to this action, the United States Department of Justice regulations implementing Title II of the ADA, 28 C.F.R. Part 35, have been in full force and effect and have applied to Defendants' conduct.

123.    At all times relevant to this action, Dr. Ford has been substantially limited in several major life activities, and as such is an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102(2).

124.    The LSBME is a public entity within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1).

125.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

126.    Federal regulations implementing Title II of the ADA provide that a public entity may not "(i) deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; (ii) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; [or] (iii) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1).

127.    Federal regulations implementing Title II of the ADA further provide that "a public entity shall operate each service, program, or activity so that the service, program or activity, when

viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R.
§ 35.150(a).

128.    Federal regulations implementing Title II of the ADA further provide that a public
entity "may not administer a licensing or certification program in a manner that subjects qualified
individuals with disabilities to discrimination on the basis of disability, nor may a public entity
establish requirements for the programs or activities of licensees or certified entities that subject
qualified individuals with disabilities to discrimination on the basis of disability. The programs or
activities of entities that are licensed or certified by a public entity are not, themselves, covered by
this part." 28 C.F.R. § 35.130(b)(6).

129.    Federal regulations implementing Title II of the ADA further provide that a public
entity "may not, directly or through contractual or other arrangements, utilize criteria or methods
of administration— (i) That have the effect of subjecting qualified individuals with disabilities to
discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3).

130.    Federal regulations implementing Title II of the ADA further provide that a public
entity may not "Otherwise limit a qualified individual with a disability in the enjoyment of any
right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service."
28 C.F.R. § 35.130(b)(1)(vii).

131.    Federal regulations implementing Title II of the ADA further provide that a public
entity "shall not impose or apply eligibility criteria that screen out or tend to screen out an
individual with a disability or any class of individuals with disabilities from fully and equally
enjoying any service, program, or activity, unless such criteria can be shown to be necessary for
the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

132.    By and through their actions set forth above, Defendants discriminated against Dr.

Ford, on the basis of disability, in violation of Title II of the ADA and its implementing regulations.

133.    Dr. Ford is therefore entitled to injunctive relief, as well as an award of attorneys' fees, costs (including expert expenses), and compensatory and nominal damages pursuant to Title II of the ADA.

## PRAYER FOR RELIEF

**WHEREFORE,** Dr. Ford respectfully prays that this Court grant the following relief against Defendant:

A.    Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices subjected Dr. Ford to unlawful discrimination in violation of the ADA;

B.    Issue an Injunction forbidding Defendants from implementing or enforcing any policy, procedure, or practice that denies Dr. Ford with meaningful access to and full and equal enjoyment of Defendants' services, programs, or activities;

C.    Issue an Injunction ordering Defendants:

　　　i.    To develop, implement, promulgate, and comply with a policy prohibiting future discrimination against Dr. Ford;

　　　ii.    To develop, implement, promulgate, and comply with a policy requiring that Defendants perform an individualized assessment of Dr. Ford;

　　　iii.    To develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf or hard of hearing of their rights under the ADA;

iv.  To perform an individualized assessment of Dr. Ford and determine the least-restrictive monitoring and other terms and conditions that are necessary as part of a legitimate safety requirement or for the provision of the service at issue;

v.  To Order that Defendants bear the costs associated with any future ongoing monitoring of Dr. Ford;

vi.  To prohibit Defendants from imposing or applying eligibility criteria that screen out or tend to screen out individual with bipolar disorder on the basis of that disability; and

vii.  To train all its employees, staff, and/or other agents on a regular basis about the rights of individuals under the ADA to an individual assessment.

D.  Award to Dr. Ford:

i.  Compensatory and nominal damages pursuant to the ADA.

ii.  Reasonable costs and attorneys' fees pursuant to the ADA.

iii.  Interest on all amounts at the highest rates and from the earliest dates allowed by law.

iv.  Any and all other relief that this Court finds necessary and appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Dr. Ford demands trial by jury on the issues of (1) the injuries she suffered as a result of Defendants' discriminatory conduct; and (2) the quantum of damages that should be awarded.

Dated: April 23, 2018

**[signature block on following page]**

Respectfully Submitted,

**BIZER & DEREUS, LLC**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
Marc P. Florman (LA # 35128)
mflorman@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

By:/s/ Garret S. DeReus
      Garret S. DeReus