UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROBIN FORD                                    CIVIL ACTION

VERSUS                                        NO. 18-4149

LOUISIANA STATE BOARD OF MEDICAL              SECTION A(2)
EXAMINERS, and CHRISTY L. VALENTINE, M.D.,
sued in her official capacity only

## ORDER AND REASONS

Before the Court is a **Motion to Dismiss (Rec. Doc. 8)** filed by Defendants, Louisiana State Board of Medical Examiners (the "Board") and Christy L. Valentine, M.D. ("Valentine"), in her official capacity (hereinafter collectively referred to as "Defendants"). Plaintiff, Dr. Robin Ford ("Ford"), opposes the motion (Rec. Doc. 12) and Defendants have replied. (Rec. Doc. 15). Defendants have also filed a **Motion to Stay Discovery (Rec. Doc. 9).** The motions, set for submission on July 25, 2018, are before the Court on the briefs without oral argument. Having considered the motions and memoranda of counsel, the record, and the applicable law, the Court finds that Defendants' **Motion to Dismiss (Rec. Doc. 8)** is **DENIED** and Defendants' **Motion to Stay Discovery (Rec. Doc. 9)** is **DISMISSED AS MOOT** for the reasons set forth below.

**I.    Background**

In 1991, the Board licensed Dr. Ford to practice osteopathic medicine. (Rec. Doc. 1, Complaint ¶ 2). In 1994, the Board conducted an investigation and discovered that Dr. Ford wrote prescriptions primarily for controlled substances in the names of other individuals for her own personal consumption and that she suffered from related issues of substance abuse. (Rec. Doc. 8, Exhibit A). After the Board's investigation, Dr. Ford signed a 1995 Consent Order which

1

suspended her license to practice medicine, placed Dr. Ford on probation with various restrictions, and provided an agreement to participate in a Physicians Health Program ("PHP"). (Rec. Doc. 1, Complaint ¶ 33-34). In the 1997 Superseding Consent Order, the Board continued the restrictions imposed on Dr. Ford, but reinstated her medical license. (*Id.* ¶ 37).

In the following year, Dr. Ford struggled with diagnosed manic depressive (bipolar) disorder. (*Id.* ¶ 35). Dr. Ford and the Board then entered into a 1998 Superseding Consent Order to accommodate Dr. Ford and her bipolar disorder as she suffered from somatic complaints, confusion, agitation, and manic episodes. (*Id.* ¶ 31). For several years, Dr. Ford remained stable and her disorder was in remission. (*Id.* ¶ 39)

In 2006, Dr. Ford relapsed with her substance abuse disorder and was diagnosed with opiate dependence. (*Id.*). Dr. Ford removed herself from the medical profession by allowing her license to expire while seeking treatment. (*Id.*). After treatment, Dr. Ford requested to renew her license and enter the re-admission process. The re-admission process required Dr. Ford to agree to and sign the 2011 Second Superseding Consent Order. (*Id.* ¶ 43-44). The 2011 Second Superseding Consent Order again included the consent to a monitoring contract provided by the PHP. (*Id.* ¶ 45). The PHP monitoring contract provided for a five year term. (*Id.* ¶ 50).

Since 2010, Dr. Ford has not relapsed. (*Id.* ¶ 55). In 2014, the Board issued a Third Superseding Order modifying the Second Superseding Consent Order to allow Dr. Ford to prescribe Schedule IV and V controlled substances. (Rec. Doc. 8, Exhibit E). The PHP released Dr. Ford from her monitoring contract in January of 2017 and imposed a new, less burdensome Post-Monitoring Contract for nine months. (*Id.* ¶ 62). In April of 2017, Dr. Ford requested the Board to reinstate the previously revoked ability to prescribe Schedule II and Schedule III controlled substances. (Rec. Doc. 8, p. 5). Soon thereafter, Dr. Ford received the April 2017 Letter

stating that her request was under advisement. (*Id.,* Exhibit F). The letter also stated, "The Board believes that licensees currently practicing with diagnosed psychiatric conditions should continue monitoring with HPFL-PHP by signing a lifetime monitoring contract." (*Id.*). The April 2017 Letter further indicated that Dr. Ford should contact Dr. Hammond at the PHP to discuss the monitoring requirements. (*Id.*). When Dr. Ford contacted Dr. Hammond, Dr. Hammond informed Dr. Ford that the PHP made a "mistake" releasing Dr. Ford from the monitoring contract. (Rec. Doc. 1, Complaint ¶ 72). Dr. Hammond further instructed Dr. Ford that if she didn't sign the New Monitoring Contract, then Dr. Hammond would report her to the Board and her license would be "taken away." (*Id.*).

## II.  Legal Standard

Federal Rule of Civil Procedure 12(b)(1) provides the vehicle by which a party can challenge a court's subject matter jurisdiction to hear a particular issue. In general, where subject matter jurisdiction is being challenged under Rule 12(b)(1), the trial court is free to weigh the evidence and resolve factual disputes to satisfy itself that it has power to hear the case. *Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004) (citing *Land v. Dollar*, 330 U.S. 731 (1947)). No presumptive truthfulness attaches to the plaintiff's allegations and the court can decide disputed issues of material fact in order to determine whether or not it has jurisdiction to hear the case. *Id.* However, where issues of fact are central both to subject matter jurisdiction and the claim on the merits, the trial court must assume jurisdiction and proceed to the merits of plaintiff's case under either Rule 12(b)(6) or Rule 56. *Id.* (citing *Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981)).

Under well-settled standards governing Rule 12(b)(6) motions to dismiss, a claim may not be dismissed unless it appears certain that the plaintiff cannot prove any set of facts that would entitle him to legal relief. *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 251 (5th Cir. 2006)

3

(citing *Benton v. United States*, 960 F.2d 19 (5th Cir. 1992)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. US Unwired, Inc.,* 565 F.3d 228, 239 (5th Cir. 2009). But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

A legally sufficient complaint need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action. *Id.* In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 257. If there are insufficient factual allegations to raise a right to relief above the speculation level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the claim must be dismissed. *Twombly*, 550 U.S. at 555.

### III. Law and Analysis

Defendants bring the instant motion pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure seeking to dismiss Dr. Ford's claims under Title II of the Americans with Disabilities Act ("ADA"). First, Defendants argue that Dr. Ford's claims should be dismissed pursuant to Rule 12(b)(1) because abstention from exercising jurisdiction is warranted under the *Younger* abstention doctrine. Second, Defendants argue that Dr. Ford's claims should be dismissed pursuant to Rule 12(b)(6) because her claims are barred by *res judicata*. Third,

4

Defendants argue that Dr. Ford's claims should be dismissed pursuant to Rule 12(b)(6) because she fails to state a claim under Title II of the ADA as a matter of law. Fourth, Defendants argue that Dr. Ford's relief against Defendants is barred in whole or in part under the doctrine of sovereign immunity.[1]

### A. *Younger* Abstention

At its core, the *Younger* abstention doctrine was initially a federal court's relinquishment of jurisdiction when necessary not to interfere with a parallel, pending state criminal proceedings. *Younger v. Harris*, 401 U.S. 37 (1971). *Younger* abstention subsequently been expanded to apply in two additional scenarios. First, *Younger* has been expanded to encompass a federal court's relinquishment of jurisdiction when necessary not to interfere with particular state civil enforcement proceedings. *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013). Second, the Supreme Court also expanded *Younger* to require abstention from interfering with state civil proceedings that implicate a state's interest in enforcing the orders and judgments of its courts. *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987). After a court has found that a case falls into one of these categories, the court potentially invoking *Younger* considers whether (1) there is an ongoing state judicial proceeding (2) that implicates important state interests, and (3) provides an adequate opportunity to raise federal challenges. *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

Defendants argue that *Younger* applies to this case because it involves a "civil enforcement proceeding" by the Board against Dr. Ford. (Rec. Doc. 15, p. 2). In support of their argument,

---

[1] Defendants originally included an additional argument under the *Rooker-Feldman* doctrine for dismissal in their Motion to Dismiss. (Rec. Doc. 8). However, Defendants withdrew their defense under the *Rooker-Feldman* doctrine in their Reply Memorandum in Support of Motion to Dismiss. (Rec. Doc. 15).

5

Defendants allege that several courts—since *Sprint Communications, Inc.*—have ruled that state disciplinary proceedings against medical providers constitute "civil enforcement proceedings."

On the other hand, Dr. Ford points out that the Supreme Court in *Sprint Communications, Inc.* explained that the *Younger* doctrine applies to civil enforcement actions when such actions are similar to a criminal prosecution in important aspects. Dr. Ford further argues that under the "civil enforcement proceeding" category of *Younger*, abstention applies when the state proceeding is characteristically "initiated to sanction the federal plaintiff—*i.e.*, the party challenging the state action, for some wrongful act." (Rec. Doc. 12, p. 6) (citing *Sprint,* 571 U.S. at 79). Dr. Ford further argues that in the second category of *Younger,* "a state actor is routinely a party to the state proceeding and often initiates the action." *Id.*

Dr. Ford argues such is not the case here. She distinguishes the instant case by pointing out that no disciplinary actions or proceedings have been initiated by a state actor against her. She contends, rather, that she received a letter regarding the Board's policy in regards to practicing physicians diagnosed with psychiatric disorders, had one meeting with a Dr. Hammond to discuss the mandatory lifelong monitoring contract, and is now subject to unnecessary, burdensome restrictions in violation of the ADA. (Rec. Doc. 12, p. 6). Finally, Dr. Ford cites *Thomas v. Texas State Bd. of Medical Examiners*, for the proposition that "a person who contends that his constitutional rights have been violated by a state administrative proceeding is not required to resort to an appeal to state courts before seeking relief in a federal forum." 807 F.2d 453, 455 (5th Cir. 1987).

To determine whether *Younger* is implicated in the instant case, the Court must first determine whether this matter involves a "civil enforcement proceeding" as contended by Defendants. In *Sprint Communications, Inc.*, the Supreme Court provided a survey of cases

6

wherein the second *Younger* category—"civil enforcement proceedings"—was found to have been applicable. In *Sprint Communications, Inc.*, the Supreme Court determined that a state court proceeding wherein the state court was asked to review a decision of the Iowa Utilities Board did not fall into the "civil enforcement proceeding" category of *Younger*. The Supreme Court looked to the IUB administrative proceeding and found that it did not resemble the state enforcement actions that the Supreme Court had previously found appropriate for *Younger* abstention. First, the Court found that the IUB proceeding was not "akin to a criminal prosecution." *Sprint Communications, Inc.*, 571 U.S. at 80. Second, the Court found it relevant that the IUB proceeding was not initiated by "the State in its sovereign capacity." *Id.* The IUB proceeding dealt with a complaint brought before the IUB by Sprint against an Iowa communications company. The Supreme Court found it relevant that the IUB's adjudicative authority was invoked to settle a civil dispute between two private parties, not to sanction Sprint for commission of a wrongful act. *Id.* To the Supreme Court, nothing suggested that the IUB proceeding was "more akin to a criminal prosecution than are most civil cases." *Id.* at 81.

In *Sprint Communications, Inc.*, the Court also looked to its previous decision in *Middlesex* wherein the "civil enforcement proceeding" category was implicated. *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423 (1982). The *Middlesex* decision illustrated that the *Younger* abstention doctrine is appropriate where "noncriminal proceedings bear a close relationship to proceedings criminal in nature." *Id.* at 432. In *Middlesex*, the *Younger* doctrine barred a federal court from entertaining a lawyer's challenge to a New Jersey state ethics committee's pending investigation of the lawyer. The Supreme Court in *Sprint Communications, Inc.* highlighted certain features of the *Middlesex* proceeding which made it a "civil enforcement proceeding" under the *Younger* doctrine. First, *Middlesex* involved an investigation and formal

7

complaint that preceded a hearing.  Second, an agency of the New Jersey Supreme Court initiated the hearing.  Third, the purpose of the hearing was to determine whether the lawyer should be disciplined for his failure to meet the state's standards of professional conduct.[2]

In analyzing the instant case, the Court does not agree with Dr. Ford's assertion that "no disciplinary actions or proceedings have been initiated by a state actor against Dr. Ford." (Rec. Doc. 12, p. 6).  In Dr. Ford's case, the Board commenced its initial investigation of Dr. Ford around 1994.  Pursuant to that investigation, the Board received "reliable information" indicating that Dr. Ford suffered from habitual and recurring use and abuse of controlled substances that are capable of inducing physiological or psychological dependence.  (Rec. Doc. 8, Exhibit A).  The investigation also found that such dependence may have affected her ability to practice medicine with reasonable skill and safety to patients.  The information received from the investigation also led the Board to find that Dr. Ford had written and issued prescriptions primarily for controlled substances in the names of other individuals primarily for self-use, and that she had converted controlled substances samples for her personal use. (*Id.*).

The Board again conducted an investigation of Dr. Ford around 1998. (Rec. Doc. 8, Exhibit C).  That investigation resulted in the Board recognizing that Dr. Ford has a history of manic depressive (bipolar) disorder and polydrug dependency.  In 2006, Dr. Ford suffered a relapse to her substance use disorder.  (*Id,* Exhibit D).  Later that year, she underwent a five-day assessment and was diagnosed with opiate dependence in relapse.  Dr. Ford's evaluating physicians opined that Dr. Ford was not capable of practicing medicine, and it was their recommendation that she

---

[2] The Court notes here, as did the Supreme Court in *Sprint Communications, Inc.*, that these three *Middlesex* conditions were not dispositive in *Middlesex*, they were, instead, additional factors appropriately considered by the federal court before invoking *Younger*.  *Sprint Communications, Inc.*, 571 U.S. at 81.

enter a residential treatment facility. Instead of entering treatment, Dr. Ford elected to remove herself from the practice of medicine and allowed her license to expire in March of 2008. (*Id.*)

In late 2009, Dr. Ford approached the Investigating Officer to determine what steps would be necessary to reinstate her license. Thereafter, the Board and Dr. Ford entered a Second Superseding Consent Order wherein certain conditions were imposed on Dr. Ford so that she may continue practicing medicine. Thereafter, around 2014, Dr. Ford requested the Board revisit the conditions imposed in the Second Superseding Consent Order. Specifically, Dr. Ford asked the Board to modify a prohibition that prevented her from prescribing, dispensing, or administering any controlled substances other than Schedule V controlled substances. In a Third Superseding Order, the Board modified the Second Superseding Consent Order and allowed Dr. Ford to prescribe Schedule IV and V controlled substances, but not Schedule II and III controlled substances. (Rec. Doc. 8, Exhibit E). On April 26, 2017, a representative from the Board sent Dr. Ford a letter stating that it was the Board's decision to deny her request to reinstate her ability to prescribe Schedule II and III controlled substances at that time. The letter also stated that the Board believes that "licensees currently practicing with diagnosed psychiatric conditions should continue monitoring with HPFL-PHP by signing a lifetime monitoring contract." (*Id.*, Exhibit F). The letter goes onto ask Dr. Ford to "contact Dr. Hammond at HPFL-PHP to schedule an appointment to meet with him to discuss . . . monitoring requirements and sign a new contract if applicable." (*Id.*)

The Court does not find that the proceedings before the Board at this stage constitute "civil enforcement proceedings" as contemplated by the *Younger* doctrine. The proceedings before the Board have morphed from being disciplinary in nature into an effort to regulate Dr. Ford's practice of medicine. Initially, the investigations conducted by the Board constituted state administrative

9

proceedings or "civil enforcement proceedings;" however, currently Dr. Ford does not have any pending proceedings conducted by the Board. The Board is merely seeking to regulate Dr. Ford in light of the prior proceedings. A state proceeding or civil enforcement proceeding is a threshold issue in the determination of whether a court will exercise the *Younger* abstention doctrine. In the absence of a pending state proceeding or civil enforcement proceeding, the Court will exercise jurisdiction and decline to invoke abstention under the *Younger* doctrine. Thus, the Court DENIES Defendants' Motion to Dismiss (Rec. Doc. 8) on grounds of Rule 12(b)(1) of the Federal Rules of Civil Procedure.

### B. *Res Judicata*

Dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds of *res judicata* may be appropriate if "the elements of *res judicata* are apparent on the face of the pleadings." *Dean v. Miss. Bd. of Bar Admissions,* 394 F. App'x 172, 175 (5th Cir.2010). Federal question issues of *res judicata* require the Court to determine whether federal or state law applies. *Aerojet-General Corp. v. Askew,* 511 F.2d 710, 715 (5th Cir. 1975).

Defendants assert that the doctrine of *res judicata* applies in accordance with Louisiana state law in the instant case because the Second Superseding Consent Order constitutes a state court administrative proceeding. (Rec. Doc. 8, p. 15). Defendants further argue that in accordance with Louisiana jurisprudence, consent orders with state licensing boards may have the effect of a compromise under Louisiana law for purposes of *res judicata*. (*Id.*) (citing *St. Pe v. La. Stat Bd. Of Nursing*, 2014-1727 (La. App. 1 Cir. 3/9/15), 2015 La. App. LEXIS 465, at *1). Defendants argue that the 2011 Second Superseding Consent Order provides for a monitoring contract and that the 2017 Letter is a continuation of the same monitoring contract. (Rec. Doc. 15, p. 5).

10

Plaintiff counters that the 2011 Consent Order is not the basis of Dr. Ford's claim and is not a final state court or federal court decision (Rec. Doc. 12, p. 16). Plaintiff asserts that the ADA is the basis of Dr. Ford's claim which is an issue of federal law implicating the federal *res judicata* doctrine. (*Id.*). Plaintiff provides that the ADA claims arise out of the April 2017 Letter which is a distinctly separate transaction or occurrence from the 2011 Second Superseding Consent Order. (*Id.* p. 17). Plaintiff also points out that the 2011 PHP Monitoring Contract issued in association with the 2011 Second Superseding Consent Order was valid for a term of five years. (*Id.*).

The Court holds that the preclusive effect of the Board's decision as asserted and formulated in to a compromise in the 2011 Second Superseding Consent Order (Rec. Doc. 8, Exhibit D) is not at issue. Dr. Ford asserts her claim under the ADA as arising out of the April 2017 Letter and the 2017 New Monitoring Contract (Rec. Doc. 12, p. 22). The Court holds that the April 2017 Letter seeks to impose additional monitoring on Dr. Ford independent of the monitoring imposed under the 2011 Second Superseding Consent Order. The April 2017 Letter states that Dr. Ford should "continue monitoring with HPFL-PHP by signing a lifetime monitoring contract." (*Id.,* Exhibit F). This language of the letter designates that the monitoring will require Dr. Ford to sign and agree to a distinct and separate contract than the agreement previously established by the 2011 Second Superseding Consent Order and 2011 PHP Monitoring Contract. The Court acknowledges language from the 2011 Second Superseding Consent Order which instructs Dr. Ford to abide by and strictly adhere "to any subsequent agreement which may be recommended by the PHP." (Rec. Doc. 8, Exhibit D). The Court declines to strictly construe this language to encompass the April 2017 Letter and 2017 Monitoring Contract. The Court DENIES Defendants' Motion to Dismiss (Rec. Doc. 8) on the grounds of *res judicata* under Rule 12(b)(6) Federal Rules of Civil Procedure.

### C. Title II of the ADA

Title II of the ADA prohibits employer discrimination of an employee who is a "qualified individual with a disability on the basis of that disability." 42 U.S.C. § 12112(a). "To establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; (3) that he was subject to an adverse employment decision on account of his disability." *Equal Emp't Opportunity Comm'n v. LHC Group, Inc.*, 773 F.3d 688, 697 (5th Cir. 2014).

It is not contested that Dr. Ford satisfies the first two elements of a discrimination claim under the ADA: (1) both parties recognize Dr. Ford qualifies as a person with a disability because she is diagnosed with bipolar disorder; and (2) Dr. Ford is qualified to be a doctor as the Board issued her a license and does not contest the validity of the license. Defendants contest the third element, Dr. Ford's ability to state a claim that she was subject to an adverse employment decision on account of her disability.

Defendants assert that Dr. Ford fails to state a claim for disability discrimination under the Title II of the ADA as a matter of law. (Rec. Doc. 8, p. 17). Defendants state that the federal regulation interpreting Title II of the ADA specifically allows public entities to drug test individuals "who formerly engaged in the illegal use of drugs." (*Id.*) (citing 28 CFR § 35.131(c)). Defendants point out that Dr. Ford formerly engaged in the use of illegal drugs as demonstrated in her Consent Order administered by the Board and signed by Dr. Ford in 1995. (*Id.*, Exhibit A). The Board reserves the right to drug test and impose other reasonable restrictions to ensure that she is not currently engaging in the illegal use of drugs. (Rec. Doc. 8, p. 18).

Plaintiff counters that the new monitoring imposed on Dr. Ford is a result of her diagnosis, not her conduct. (Rec. Doc. 12, p. 26). Specifically, Dr. Ford has not experienced problems or

setbacks related either to her bipolar disorder or former drug use issue in eight years. (*Id.*) The Board is implementing unnecessary and untailored restrictions solely based upon her psychiatric diagnosis. (*Id.*, p. 26) Plaintiff states this is indicated by the following language contained in the April 2017 Letter, "Licensees currently practicing with diagnosed psychiatric conditions should continue monitoring with the HPFL-PHP by signing a lifetime monitoring contract." (*Id.*, p. 25).

The Court holds that Dr. Ford has pled enough facts under the ADA to state a claim to relief that is plausible on its face. The April 2017 Letter states, "Licensees currently practicing with diagnosed psychiatric conditions should continue monitoring with the HPFL-PHP by signing a lifetime monitoring contract." (Rec. Doc. 8, Exhibit F). It is clear from the language of this letter that the monitoring contract is related to Dr. Ford's "diagnosed psychiatric condition," bipolar disorder. This is further evidenced by the PHP release of Dr. Ford from the Monitoring contract provided in a letter dated January 17, 2017. (Rec. Doc. 1, Complaint ¶ 7).[3] Subsequently, the Board required Dr. Ford to enter into a less restrictive Post-Monitoring Contract to which Dr. Ford successfully complied with for nine months. (*Id.*, ¶ 61-63). While 28 C.F.R. § 35.131 expressly interprets the ADA to allow public entities, such as the Board, to drug test individuals with ADA approved disabilities, the policies or procedures must be "reasonable." Failure to provide reasonable policies or procedures may result in discrimination under Title II of the ADA. Whether or not the policies or procedures of the 2017 Monitoring Contract are "reasonable" is not presently before the Court to decide. Based upon the facts pled by Plaintiff, the Court holds that Plaintiff has pled enough facts to state a claim for relief of discrimination under Title II of the ADA. The Court DENIES Defendants' Motion to Dismiss (Rec. Doc. 8) under Rules 12(b)(6) of the Federal Rules of Civil Procedure.

---

[3] The Court notes that after receipt of the April 2017 Letter Dr. Ford brought the release to the Board's attention; the Board stated the release was a "mistake." (Rec. Doc. 1, Complaint ¶ 72).

## D. Eleventh Amendment Sovereign Immunity

This Court has consistently held that the Board is a state agency entitled to Eleventh Amendment immunity. *Hunter v. Louisiana State Board of Medical Examiners*, 2016 WL 3388380, at *2 (E.D. La. June 20, 2016). Because the Board is entitled to sovereign immunity, it necessarily follows that Plaintiff's claims against the Board and its members in their official capacities are barred. *Id*. The Supreme Court held that Congress may abrogate Eleventh Amendment sovereign immunity pursuant to authority granted by the Fourteenth Amendment § 5. *Kimel v. Florida Board of Regents,* 528 U.S. 62, 80 (2000). In *Tennessee v. Lane,* the Supreme Court implemented a two part test to resolve whether Congress has abrogated the State's Eleventh Amendment immunity under Title II of the ADA: (1) Whether Congress unequivocally expressed its intent to abrogate that immunity; and (2) if it did then whether Congress acted pursuant to a valid grant of constitutional authority. 541 U.S. 509, 509 (2004).

The language of Title II of the ADA provides, "A state shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 USC § 12202. Since it is clear that Congress unequivocally expressed the intent to abrogate sovereign immunity, it is necessary next to determine whether Congress acted pursuant to a valid grant of constitutional authority. *Lane* remains relevant in the analysis to this case insofar as the Supreme Court stated that Title II seeks to enforce the Fourteenth Amendment's prohibition on irrational disability discrimination and seeks to also enforce a variety of other basic constitutional guarantees. 541 U.S. 509, 510. The Supreme Court in *U.S. v. Georgia* further held Congress validly abrogates sovereign immunity for conduct that violates the Fourteenth Amendment. 546 U.S. 151, 151 (2006).

Defendants argue that if the Court finds Dr. Ford does in fact have a valid claim under Title II of the ADA then the Court further lacks subject matter jurisdiction because the claim is barred under the Eleventh Amendment. (Rec. Doc. 8, p. 20). Defendants assert that the Complaint (Rec. Doc. 1, Complaint) does not include an allegation that Defendants violated the Fourteenth Amendment. (*Id,* p. 21). Dr. Ford counters that the conduct of the Board implicated Dr. Ford's Fourteenth Amendment right of procedural due process. (Rec. Doc. 12, p. 31). Defendants respond that the process set forth in the 2011 Second Superseding Consent Order was Dr. Ford's means to be heard. (Rec. Doc. 15, p. 13). The Court rejects Defendants argument because the April 2017 Letter is separate and distinct from the 2011 Second Superseding Consent Order as for the reasons given above.

When Dr. Ford received the April 2017 Letter, she also received a call from Dr. Hammond, Medical director of the HPFL-PHP. (Rec. Doc. 1, Complaint ¶ 72). Dr. Hammond stated that if Dr. Ford did not sign the new monitoring lifetime contract her license would be "taken away." (*Id.* ¶ 74). Thereafter, Dr. Ford signed the new contract with the understanding that otherwise her license would be revoked. (*Id.* ¶ 75). Under these facts, the Court holds that Dr. Ford has pled enough facts to render plausible on its face that the Board failed to afford procedural due process and the opportunity to be heard as required in accordance with the Fourteenth Amendment. Thus, the Court DENIES Defendant's Motion to Dismiss (Rec. Doc. 8) under the Eleventh Amendment.

### E. Motion to Stay Discovery

Defendants request to that discovery be stayed until the Court decides the Motion to Dismiss (Rec. Doc. 8). Defendants argue that discovery is not likely to produce facts relevant to the legal issues presented in the Motion to Dismiss. (*Id.*). The Court DISMISSES the motion as moot.

## IV. Conclusion

The Motion to Dismiss (Rec. Doc. 8) is DENIED. Plaintiff's claims are not dismissed pursuant to Rule 12(b)(1) because the *Younger* abstention doctrine is not implicated. Plaintiff's claims are not barred pursuant to Rule 12(b)(6) because the doctrine of *res judicata* does not apply and Plaintiff has pled sufficient facts that if proven might entitle her to legal relief. Also, Plaintiff has pled sufficient facts to state a claim to relief that is plausible on its face under Title II of the ADA. Title II of the ADA validly abrogates sovereign immunity in this case by a valid exercise of Congressional power under the Fourteenth Amendment. The Motion to Stay Discovery (Rec. Doc. 9) is moot.

Accordingly;

IT IS ORDERED that Defendants' **Motion to Dismiss (Rec. Doc. 8)** is **DENIED**;

IT IS FURTHER ORDERED that Defendants' **Motion to Stay Discovery (Rec. Doc. 9)** is **DISMISSED AS MOOT.**

New Orleans, Louisiana, this 12th day of October, 2018

                                            JUDGE JAY C. ZAINEY
                                            UNITED STATES DISTRICT JUDGE